Thank you. Good morning, Your Honor. Again, my name is Murray Singer. I represent the appellant Christopher Thomas. I would like to at least begin my argument with you this morning discussing the missing telephone recordings and specifically the denial of the requested continuance to obtain those. There is no doubt in the record that there were over a hundred phone calls, recorded phone calls from the jail where Mr. Thomas was being held, that the recordings never reached him. The government has indicated that they turned over whatever calls had been received from the jail. The jail receives them from an outside company called Securus that maintains the recording system. And the government says that they turned over everything that they received. And I'm not here to argue about that. Mr. Thomas spent considerable time over a year advising the court that he was concerned that there were calls that were missing, that he recalls a number of calls that he made with a woman who's known in the record as JG, who was one of the co-conspirators, who became a cooperating witness and was a very important witness at the trial against him. And he recalls and he states over and over again that I had many, many calls with her where we discussed what was going on and discussed what he claims is the defense that he testified about, that this was not to be commercial sex acts, but they were essentially using the lure of prostitution to commit robberies, and that he discussed these with JG on the phone. And for over a year, beginning in early 2022, he was advising the court that I know that there are a number of calls that are missing. And efforts were made to get them. Ultimately, in early 2023, within a couple of months of the trial date, he had issued his own subpoena to Securus, and Securus did not provide recordings. What they provided was a list of the calls. And there were 108 calls on that list that had not been provided to him. And he, again, for months and months, had been trying to get these calls that he insisted were critical to his defense, that they contained critical cross-examination material for JG to challenge her testimony. And it also would, in his view, corroborate the testimony that he gave when he testified on his own behalf. And the court repeatedly denied him the calls, which were between him and JG. They would have only been admissible to the extent they would have been prior inconsistent statements by JG to impeach her testimony, right? Yes. Which is only impeachment value, not for the truth, right? I mean, prior consistent, prior inconsistent statements can be purposes at different times. But my impression is that a prior inconsistent statement that's not under oath is only admissible for impeachment value. But is that not correct? That is correct, Judge. In the context of the trial, the way it would play out is that the jury, to the extent that the there were inconsistent statements in those recordings, those inconsistent statements could be played for the jury or if the witness acknowledged them. Right, they would have only been admissible to impeach JG. They would not have been, because you said they could have also corroborated his story, but they would not have been admissible for the truth. He would not have been able to say, you heard a prior inconsistent statement, you should believe it. Correct. Under the rules of evidence? Yes. Okay. I just don't understand the scope of what they're admissible for if they had existed. I think that is correct, Judge. But the defense would, I mean, I suppose if there was a claim that the defendant had recently fabricated in some way, his own testimony, then perhaps they could be introduced. No, they wouldn't have been admissible because he was already arrested for these things. So recent fabrication, they're only admissible for the truth to rebut claims of recent fabrication if the motive to fabricate had not yet arisen. And in any event, you can't do that as to yourself. They're still your own statements. So his statements would not have been. Understood. I'm just, again, trying to understand the slice of what they're admissible for. In the context of the trial, though, the jury would have heard the impeachment material and the jury would then hear the defendant testify at trial and say, this is what was going on and this is what our purpose was. So there would be a limitation on the use that could be made of it in argument at the end of the case. But it's out there in front of the jury and that's powerful information. The court, I understand that this is a matter of an abusive discretion by the court when we're talking about the granting or denying of a continuance and that that's a standard we have to look at. But we're also looking at the defendant's right to present his defense, to have the information to be able to cross-examine a significant government witness. And the reasons used by the trial judge to deny the continuance, I submit, are the things that we look to to determine whether there was an abusive discretion. We have to look at why the judge denied the continuance. Well, she said, you know, I've appointed you four lawyers and you're never going to get along with your lawyers. As I laid out in my brief, that was not accurate. The first lawyer who was on the case for about seven, eight months retired. The second lawyer who was appointed was only technically appointed for a month because at the moment, at the time, he was withdrawing from the CJA panel and never met Mr. Thomas. I thought it was also not until a couple days or a couple letters in before Mr. Thomas specified what evidence he thought he was going to get, what the value of it was going to be. Well, he indicated in general terms that it was going to support his defense or be used for impeachment. And in response to the judge saying, well, you haven't told us why this information is important or what it's going to be, to say you haven't told us specifically what's in it seems like an unrealistic bar since he didn't have them. But he was a participant in the conversation. So, you know, it's not as if he's aware of calls that existed that he wasn't a participant to that he'd have to listen to. But he was one of the speakers on the call. So he had a firsthand knowledge of what those communications were. And there were three years earlier and he was going on memory and he says, I know that I talked about this. And he did. When the court indicated you haven't been specific, he followed up with another letter and another motion request for continuance and said, this is what's going to be in it. There is impeaching material. It goes directly to my knowledge and intent and what I was, what I understood this scheme to be. The judge told him that he had ample time to review the calls, even though he never received the calls. But I thought there was an issue of whether he received the calls and then to facilitate him getting the calls. Attorney TFO Wurstmeier on March 15th went to the facility, picked up a device or a thumb drive or CD or whatever it was with the calls on it and delivered it to directly to your client. Did that not happen a few days before, like a week before trial? Trial started March 22nd, I think. I don't believe there's anything in the record that indicates what was on that drive. Mr. Thomas has insisted from the beginning and to this day that the 108 calls that are designated, that are marked and it's in the appendix here, the 108 calls were never received by him. He got a printout from Securus, all the calls during the time period, about a one-month time period, and there were 108 calls that were missing. And he never got those. Now, why or how, it's never explained. And the government, I don't believe, is in a position, I don't know what counsel will argue, but there is nothing in the record and the government never stated at the trial that these 108 missing calls were in fact provided to Mr. Thomas. And so he never had the material. I see that my time is up. If there are other questions, I would love to jump into that. Another issue? There's been some time for rebuttal. Thank you. All right. Thank you very much. We'll hear from the government. May it please the court, Catherine Capita for the United States. I also represented the United States at trial in this matter. In response to counsel's argument related to the denial of the defendant's request for continuance to obtain the jail calls, which the government referred to in its brief as the January 2020 calls, the district court did not act arbitrarily, nor can the defendant establish the prejudice he has established. First, the district court did not act arbitrarily because by January 2020, the district court had ordered the government to go back to the facilities at which the defendant had been housed and request all of his communications again. So that happened for the first time during the investigation. And then again, in January 2020, we contacted the facilities at which she was housed, including the Albany County Jail, requested his communications again and provided those. It wasn't until March 2023 that the defendant actually specified the calls that he was looking for. And that's in one of his letters to the court. Those calls took place between January 14th, January 4th, 2020 and January 14th, 2020. That is a timeframe that the government never received calls for. It's noted in an FBI 302 that's mentioned in the docket, docket number 143 in a letter that I submitted to the court. That information was provided to the defense at least 15 months before trial. And then it was provided directly to the defendant when he represented himself in November 2022. At that point, the court had already issued a subpoena pursuant to the defendant's request to secure us. The court issued that in January 2023. So before the court even knew that calls were actually made during the timeframe for which the government never received any calls, the court ordered the government to go back to the facilities, which we did, and the court granted the defendant's request for a subpoena. But we don't know what the defendant actually requested because he didn't provide the proposed subpoena to the court. All we know is that at the pre-trial conference, the defendant said his problem was not with Securus, the company that he purportedly subpoenaed for the calls, but it was with either the jail or the government. His trial counsel at that time noted that he had spoken to a tech with Securus and he understood his options for obtaining the recorded calls. But even if the defendant said a pre-trial conference, when that was March 14th, 2023. But even if the defendant had obtained these calls, which we don't know whether these calls are stored at Securus, we do know that the government tried to obtain all of the defendant's communications from the jail and provided all of those calls to the defendant. But assuming for the sake of argument that these calls are actually preserved somewhere, and assuming for the sake of argument that they include victim nine stating that she did not engage in commercial sex, which again, we have no, nothing in the record to support the defendant's assertion that that's what these calls contained. Even if he had those, he cannot establish prejudice because the evidence against the defendant was so overwhelming. It included a detailed recorded confession where he admitted to trafficking victim nine. And his confession was corroborated through witness testimony, recorded telephone calls, text messages, and the testimony of victim nine. I just want a clarification. I believe it's page 42 of your brief. You noted that the government never had the calls. They were provided on November 2nd. The remaining seven calls, Stardust, not provided, had been provided earlier to his attorneys, other calls other than January. And then, including Mr. Wallenstein, and were provided to Thomas at ACCF, and I'm reading from the brief, by TFO Horstmeyer on March 15, 2023. You now referenced a pretrial on March 14th. So was there yet another effort to get additional calls from Securus or? No, Your Honor. What happened was the government provided Mr. Thomas with a hard drive that contained all the calls, well, what I believe were all the calls in our possession at the time. And in going up to trial, I double-checked to make sure he had everything that his attorneys had. And there were some missing. I saw the screenshots with the comparisons. Yes, that's exactly right. Those are those calls, the calls that were in the government's possession, not calls that, not the January calls. Yes, that's exactly right. I just wanted to clarify. Thank you, Your Honor. Now, similarly to the denial of his continuance, the defendant could not establish that the court abused its discretion when it denied his request to proceed pro se after 10 witnesses had testified at trial. At that point, the defendant's right to represent himself was sharply curtailed, and the district court, far from making an arbitrary decision, analyzed the factors that it had to and determined that any prejudice to his interests did not overbalance the risk to the trial. The district court went through a thorough analysis and came to the conclusion that the risk to the trial was too great. And finally, Your Honors, with respect to the suppression issue, it's the government's position that the district court did not err. The defendant never invoked his right to counsel. And even if the district court had erred, that would be a harmless error. If Your Honors have no questions. Thank you. Your Honor, I will touch upon the denial of Mr. Thomas' request to go pro se since it was raised by the government. The reasons given by the court simply do not support the decision that the court ultimately made. Mr. Thomas had conducted the jury selection in the opening without incident. There was no problem. He was not difficult, and the judge actually noted that. The reasons relied on by the judge to deny him the right to go pro se was the judge telling Mr. Thomas, well, you need to communicate with your counsel better. That wasn't the issue. They were communicating. They were disagreeing, but they were communicating. So that's not a basis to say, well, you need to talk to your counsel more. They were doing that. The judge told Mr. Thomas, well, I told you at the time that you can't take it back. I understand on a personal level why a judge may wish to why you state that, but it seems to me a personal, not a legal reason. But isn't that generally the rule that you can't switch back and forth between pro se and counsel status? I mean, I thought the judge was not expressing a personal preference. The judge was explaining how it works. Are you suggesting that's not how it works and that judges generally, unless there's a good reason not to, the default rule is you have to let people opt in and out of pro se status? Well, generally, that is the rule, yes. Really? But it's not. Well, no, generally it's the rule that you can't go back and forth.  But that's not an absolute hard and fast rule. The courts have talked about exercising discretion by looking at the factors. There was going to be no disruption of the proceeding here. Mr. Thomas was not asking for a delay. He was ready to stand up and take over cross-examination of witnesses and the conduct of the defense. There was nothing that was going to delay the trial, and he had not in any way delayed or obstructed the trial earlier. There wasn't any reason for a concern. And, again, the judge raised the fact, well, you've had four attorneys. You can't seem to get along with any attorney. That is simply not accurate and not fair, and it should not provide a basis to deny a fundamental constitutional right in terms of counsel or representing yourself. My time is up. Thank you very much. Thank you, counsel. Thank you both. We'll take the case under advisement.